**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF TEXAS**
**TEXARKANA DIVISION**

| | |
|---|---|
| POWERMAT TECHNOLOGIES LTD., <br><br> Plaintiff, <br><br> v. <br><br> ANKER INNOVATIONS LTD. <br><br> Defendant. | Case No. <br><br> **JURY TRIAL DEMANDED** |

**COMPLAINT FOR PATENT INFRINGEMENT**

Plaintiff Powermat Technologies Ltd. ("Powermat"), by and through its undersigned counsel, files this complaint under 35 U.S.C. § 271 against Defendant Anker Innovations Ltd. ("Anker"), and alleges as follows, upon actual knowledge with respect to itself and its own acts, and upon information and belief as to all other matters.

**NATURE OF THE ACTION**

1.      This is an action for patent infringement arising under the Patent Laws of the United States, 35 U.S.C. § 1, *et seq.*

**THE PARTIES**

2.      Plaintiff Powermat Technologies Ltd. is an Israeli limited liability company with a principal place of business located at 94 Derech Shlomo Shmeltzer, Bldg Brosh, Kiryat Arie, Petah Tivka 4970602, Israel.

3.      Upon information and belief, Defendant Anker Innovations Ltd. is a corporation organized and existing under the laws of Hong Kong, with a principal place of business located at

1

Room 1318-19, Hollywood Plaza, 610 Nathan Road, Mongkok, Kowloon, Hong Kong SAR, Peoples Republic of China.

## JURISDICTION AND VENUE

4.      This Court has subject matter jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1338(a) because the action arises under the patent laws of the United States, 35 U.S.C. § 271, *et seq.*

5.      This Court has personal jurisdiction over Anker pursuant to due process and/or the Texas Long Arm Statute because, *inter alia*, (i) Anker has done and continues to do business in the United States, including in the State of Texas; (ii) Anker has committed and continues to commit acts of patent infringement in the United States, including in the State of Texas, including making, using, offering to sell, and/or selling accused products in the United States and Texas, and/or importing accused products into the United States and Texas, including by Internet sales and sales via retail and wholesale stores, inducing others to commit acts of patent infringement in the United States and Texas, and/or committing at least a portion of any other infringements alleged herein.

6.      In addition, or in the alternative, this Court has personal jurisdiction over Anker pursuant to Fed. R. Civ. P. 4(k)(2).

7.      Venue is proper in this district as to Defendant. Anker is organized under the laws of Hong Kong. 28 U.S.C. § 1391(c)(3) provides that "a defendant not resident in the United States may be sued in any judicial district, and the joinder of such a defendant shall be disregarded in determining where the action may be brought with respect to other defendants."

## PATENTS-IN-SUIT

8.      The Asserted Patents are U.S. Patent Nos. 8,283,812; 8,626,461; 9,048,696; 8,981,598; 9,006,937; 9,083,204; and 8,049,370.

9.      U.S. Patent No. 8,283,812 ("the '812 Patent," attached hereto at Exhibit 1) duly issued on October 9, 2012, and is entitled "Inductive Power Providing System Having Moving Outlets." Powermat is the owner by assignment of the '812 Patent and possesses all rights under the '812 Patent, including the exclusive right to recover for past and future infringement.

10.     U.S. Patent No. 8,626,461 ("the '461 Patent," attached hereto at Exhibit 2) duly issued on January 7, 2014, and is entitled "Efficiency Monitor for Inductive Power Transmission." Powermat is the owner by assignment of the '461 Patent and possess all rights under the '461 Patent, including the exclusive right to recover for past and future infringement.

11.     U.S. Patent No. 9,048,696 ("the '696 Patent," attached hereto at Exhibit 3) duly issued on June 2, 2015 and is entitled, "Transmission-Guard System and Method for an Inductive Power Supply." Powermat is the owner by assignment of the '696 Patent and possess all rights under the '696 Patent, including the exclusive right to recover for past and future infringement.

12.     U.S. Patent No. 8,981,598 ("the '598 Patent," attached hereto at Exhibit 4) duly issued on March 17, 2015 and is entitled, "Energy Efficient Inductive Power Transmission System and Method." Powermat is the owner by assignment of the '598 Patent and possesses all rights under the '598 Patent, including the exclusive right to recover for past and future infringement.

13.     U.S. Patent No. 9,006,937 ("the '937 Patent," attached hereto at Exhibit 5) duly issued on April 14, 2015 and is entitled, "System and Method for Enabling Ongoing Inductive Power Transmission." Powermat is the owner by assignment of the '937 Patent and possesses all rights under the '937 Patent, including the exclusive right to recover for past and future infringement.

14.     U.S. Patent No. 9,083,204 ("the '204 Patent," attached hereto at Exhibit 6) duly issued on July 14, 2015 and is entitled, "Transmission-Guard System and Method for an Inductive

Power Supply." Powermat is the owner by assignment of the '204 Patent and possesses all rights under the '204 Patent, including the exclusive right to recover for past and future infringement.

15.     U.S. Patent No. 8,049,370 ("the '370 Patent," attached hereto at Exhibit 7) duly issued on November 1, 2011 and is entitled, "Centrally Controlled Inductive Power Transmission Platform." Powermat is the owner by assignment of the '370 Patent and possesses all rights under the '370 Patent, including the exclusive right to recover for past and future infringement.

## **BACKGROUND**

### **Powermat's History**

16.     Powermat was founded in 2006 in Neve Ilan, Israel, with the mission of enabling a 100% wireless future, in which devices and machines enjoy seamless, unlimited access to wireless power.

17.     Powermat offers a suite of standards-based and proprietary wireless power solutions, which have been incorporated into products and services across the globe, spanning a multitude of industries and sectors, including automotive, robotics, defense, consumer electronics, healthcare, and telecommunications.

18.     A core aspect of Powermat's wireless charging technology is inductive charging— a type of wireless power transfer that uses induction coils to create an alternating electromagnetic field, thereby transferring energy from a transmitter unit (*e.g.*, a wireless charging station) to a receiver unit (*e.g.*, a smartphone). The receiver unit then converts the energy into power that can charge a battery (*e.g.*, the battery within the smartphone).

4



19.     Powermat was one of the first companies to enter the domain of magnetics induction, reflected today in Powermat's significant brand recognition and technology leadership, and in the quality and breadth of its patent portfolio.

20.     In its early years (2006-2011), Powermat focused on introducing wireless power to consumers and building out its ecosystem of power transmitters and receivers. During this period, Powermat formed a number of strategic partnerships to commercialize its products, including with companies such as Homedics, T-Mobile, and General Motors. Products developed over this period included wireless charging platforms, mats, and other surfaces, as well as cases and backdoors for smartphones and gaming devices.

21.     In 2012, Powermat partnered with Duracell to expand its retail presence in the United States and the United Kingdom. That same year, Powermat partnered with Starbucks in what started as a ten-store pilot in Boston, and later turned into a 12,000-plus charging spot installation across five U.S. cities—New York, San Francisco, Los Angeles, Chicago, and Boston. Powermat's charging networks were installed by a number of significant brands, including McDonald's, Coffee Bean & Tea Leaf, Madison Square Garden, and Westfield.

22.     As a recognized leader and pioneer in wireless charging, Powermat collaborated with Procter & Gamble, Starbucks, and AT&T in 2012 to form the Power Matters Alliance (PMA),

a non-profit industry organization whose mission was to advance a suite of standards and protocols for wireless power transfer for mobile electronic devices. Around that same time, Powermat specifications were added as a requirement for certain mobile devices sold by AT&T, including Samsung, LG, ASUS, and Kyocera.

23.     Today, Powermat's technology can be found in millions of products, including mobile devices, electronic accessories, and automobiles. Recognizing its significant role in the wireless charging space, Powermat also developed a broad and extensive patent portfolio.

**Powermat's Patent Portfolio and the WPC**

24.     Powermat's patent portfolio includes well over 150 patents, with dozens more pending, directed to various aspects of wireless charging. These patents cover both the power transmitter side (*e.g.*, the functionality incorporated into a wireless charging pad) and the power receiver side (*e.g.*, the functionality incorporated into products to allow wireless charging, including such products as mobile phones, wireless earbuds, watches, and more).

25.     Many patents in Powermat's portfolio predate the major wireless charging standards, including Qi (pronounced "chee")—the most widely adopted wireless charging standard. Many of the most popular consumer electronics goods are compatible with Qi.

26.     The Qi Standard is developed and maintained by the Wireless Power Consortium (WPC). Many of Powermat's patents are essential to practicing the Qi Standard. The first version (Version 1.0) of the Qi Standard was issued in July 2010.[1] All of the patents that Powermat asserts in this Complaint are Standard Essential Patents (SEPs), reflecting Powermat's significant contributions to the Qi Standard.

---

[1] *See* https://www.wirelesspowerconsortium.com/knowledge-base/specifications/history-of-the-qi-specification.html.

27.     Similar to many standard setting organizations (SSOs), the WPC has an intellectual property rights (IPR) policy, requiring that its members make certain SEPs available for license on reasonable and non-discriminatory (RAND) terms.

28.     Specifically, the WPC's current IPR policy designates certain rights as "necessary" for the implementation of the Qi Standard.

> "Necessary Claims" means only those claims of any patent which would necessarily be infringed by implementation of an Approved Wireless Power Specification. A patent claim is "necessarily infringed" only when there is no technically reasonable non-infringing alternative for implementing an Approved Wireless Power Specifications (or portion thereof) without infringing the relevant patent claim.

> For the avoidance of doubt, the Members understand that no undertaking or licensing obligation hereunder (or pursuant to the Corporation in any way) shall require or extend to include patents or claims related to: (i) implementations of other recognized standards, even if those are referenced in the Approved Wireless Power Specification; (ii) any portions of products or devices other than those wireless charging portions of a product or device which are needed in order to comply with an Approved Wireless Charging Specification; or (iii) semiconductor manufacturing or semiconductor process intellectual property.

WPC (IPR) Policy, Article I Patent Licensing, Section 1.1 at 2 (available at https://www.wirelesspowerconsortium.com/data/downloadables/2/7/1/8/20200624-wpc-inc-ipr-policy.pdf).

29.     The WPC's IPR policy requires its members to license its "Necessary Claims" for RAND terms, with respect to power transmitters (*e.g.*, a device that transmits a wireless power charging signal) and power receivers (*e.g.*, a device that receives a wireless power charging signal) that are fully compliant with an Approved Wireless Power Specification:

> Each member undertakes to grant or cause the grant, on its own behalf on behalf of its Affiliated Entities and, subject to faithful performance of license terms, non-exclusive, non-transferrable, non-sublicenseable, world-wide licenses:

> (a)     on RAND Terms under its Necessary Claims to make, use, sell, offer to sell, import and otherwise dispose of Compliant Transmitters,

(b)      on RAND Terms under its Necessary Claims to make, use, sell, offer to sell, import and otherwise dispose of Compliant Other Receivers, and

(c)      on RF Terms under its Necessary Claims solely to make, use, sell, offer to sell, import, and otherwise dispose of Compliant Lower Power Receivers.[2]

*Id.*, Section 1.3 at 4.

30.     As a longtime member of and significant contributor to the WPC, Powermat takes its RAND obligations seriously. As a result, Powermat has established standard rates for the licensing of its SEPs, which are RAND (*i.e.*, consistent with its obligations under the WPC's IPR policy) and have been accepted by the industry. Powermat has also established standard royalty rates for its non-SEPs, which have also been accepted by the industry.

31.      Anker is also a member of the WPC, and in fact has declared several of its products, including many of the products identified in this Complaint, as complying with the Qi Standard.

32.     Additionally, the Qi Standard provides examples of reference designs that can be implemented by manufacturers to ensure that their power transmitters and receivers are in compliance therewith. For each reference design, the Qi Standard provides a general description and a functional block diagram, along with mechanical and electrical details for the corresponding component.

33.     A manufacturer of a Qi-compliant product can specify to the public, via the WPC's website, the particular reference design(s) with which its products comport. In this regard, Anker has identified the reference designs with which several of its products are compliant.

---

[2] "Lower Power Receiver" is defined as a Receiver that is not capable of receiving more than 5 watts of charging power from a Transmitter. *Id.*, Section 1.1 at 2.



https://www.wirelesspowerconsortium.com/products/12316.

34.    Anker has identified, on the WPC website, several of the accused products listed herein as complying with one or more Qi reference designs.

**Powermat's Negotiations with Anker**

35.    Anker is aware that Powermat is a member of the WPC, and that it has many patents that contain "Necessary Claims" under the WPC's IPR Policy.

36.    Anker is also aware that Powermat has several patents that a party must infringe in order to comply with a particular Qi reference design, including reference designs Anker has admitted adopting through the WPC's website.

37.     Powermat has reached out to Anker on numerous occasions regarding its wireless charging patent portfolio. For example, Anker has been aware of Powermat's patent portfolio relating to wireless charging since at least November 11, 2018.

38.     For example, on that date, Mr. Alex Levit from Powermat sent a letter to Anker's legal department, explaining that it was the owner of certain essential patents that are necessary for compliance with the Qi Standard, as well as other wireless charging standards. Mr. Levit also explained that Anker had been incorporating Powermat's patented technology into its products, at least by virtue of its purported compliance with the Qi Standard. The letter included exemplary infringement claim charts for several of Powermat's SEPs, including the '812, '461, '696, '598, '937, and '204 Patents asserted herein (in Counts 1, 2, 3, 4, 5, and 6, respectively). The parties also exchanged a number of communications between December 2018 and January 2019 regarding potential business opportunities, including conducting at least one in-person meeting in January 2019, but no agreement was reached.

39.     On August 5, 2020, Powermat sent a letter to Messrs. Ben Zhang and Owen Yu of Anker regarding Anker's need to license Powermat's portfolio. That letter identified several Anker products and a list of SEPs to which those products required a license, including all patents asserted herein. Powermat did not receive a response to its August 5, 2020 letter.

40.     On November 12, 2020, Powermat sent follow-up emails to Messrs. Kola Xiang, George Tang, and Ben Zhang at Anker, enclosing the August 5, 2020 letter. Powermat did not receive a substantive response to its November 12, 2020 email. Between December 21, 2020 and September 2021, Powermat sent at least five follow-up emails, to which it received no meaningful response.

41.     On January 30, 2023, Powermat (through its outside counsel) sent a letter to Anker's legal department, reiterating that Powermat's patent portfolio includes a number of patents that are necessary for implementing the Qi Standard (SEPs). The letter identified several Anker products, including Anker's wireless chargers, magnetic wireless chargers, 3-in-1 Cube, wireless charger stands, wireless charger stations, and wireless car chargers (*e.g.*, MagGo), and listed a number of Powermat patents, including the '696, '598, '937, and '204  Patents asserted herein (in Counts 3, 4, 5, and 6, respectively). Powermat did not receive a response to its January 30, 2023 letter.

42.     On May 11, 2023, Powermat sent follow-up letters to Anker's legal and intellectual property departments reiterating the above and identifying additional patents, including the '812, '461, '696, '598, and '370 Patents asserted herein (in Counts 1-4 and 7, respectively). To date, Powermat has not received a response to its May 11, 2023 letter. In fact, Anker has refused to engage in any meaningful discussions regarding the licensing of its patent portfolio.

43.     In view of Anker's refusal to negotiate in good faith, or even to acknowledge Powermat's correspondence or otherwise engage in any discussions about licensing Powermat's SEPs, Anker has demonstrated that it is an unwilling licensee.

44.     The United States Department of Justice, with the United States Patent and Trademark Office (USPTO) and the National Institute of Standards and Technology (NIST), have made clear that patent owners and potential licensees of SEPs should "engage in good-faith negotiations to reach F/RAND license terms" to "help reduce the costs and other burdens associated with litigation." 2019 Policy Statement on Remedies for SEPs Subject to Voluntary F/RAND Commitments, https://www.justice.gov/atr/page/file/1228016/download (December 19, 2019).

45.     Anker has been operating and continues to operate without a license to Powermat's standards-essential and other patents. The parties' licensing negotiations to-date have been unsuccessful due to Anker's refusal to respond to Powermat's several communications or otherwise engage in good-faith discussions about licensing Powermat's patent portfolio.

46.     Powermat is left with no choice but to bring the instant action to protect and enforce its intellectual property rights and the substantial investments made therein.

## COUNT 1 – INFRINGEMENT OF U.S. PATENT NO. 8,283,812

47.     Powermat incorporates paragraphs 1-46 above by reference.

48.     The '812 Patent discloses a protection system and method for preventing an inductive power system or transmitter from transmitting power in the absence of an electric load (*e.g.*, a mobile device with wireless charging capability). The '812 Patent discloses that this may be achieved, for example, by detecting whether a primary inductor of a power outlet is inductively coupled to a secondary inductor and transmitting power, and disconnecting the primary inductor from its power supply if no secondary inductor is detected.

49.     Defendant has directly infringed one or more claims of the '812 Patent in this district and elsewhere in Texas, including at least claims 9-11 literally and/or under the doctrine of equivalents, by or through its sale, offer for sale, manufacture, use, or import of its wireless charging products, including at least the Anker 747 3-in-1 Cube with MagSafe, Anker 737 MagGo Charger (3-in-1 Station), 613 Magnetic Wireless Charger (MagGo), 623 Magnetic Wireless Charger (MagGo), 633 Magnetic Wireless Charger (MagGo), 544 Wireless Charger (4-in-1 Stand), 533 Magnetic Wireless Charger (3-in-1 Stand), 313 Wireless Charger (Stand), 315 Wireless Charger (Pad), 313 Wireless Charger (Pad), 335 Wireless Charger (3-in-1 Station), 622 Magnetic Battery (MagGo), 633 Magnetic Battery, 621 Magnetic Battery (MagGo), 622 Magnetic Battery (MagGo), 521 Magnetic Battery (PowerCore 5K), and 533 Wireless Power Bank (PowerCore 10K)

(collectively, "the '812 Accused Products"). Powermat reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '812 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

50.     At least some of the asserted claims of the '812 Patent are essential to practicing the Qi Standard. Anker has indicated the Anker 313 Wireless Charger (Pad) ("Anker 313 Pad") as complying with the Qi Standard. In addition, Anker has indicated the Anker 313 Pad as comporting with the Qi Standard's A11a power transmitter design. As such, the Anker 313 Pad, and all materially similar Anker products, infringe at least claims 9-11 of the '812 Patent, literally and/or under the doctrine of equivalents.

51.     Each of the '812 Accused Products, including for example, the Anker 313 Pad, is a wireless charger, and therefore is and/or includes an inductive power outlet for transmitting power to an electric load.




https://www.anker.com/products/a2503?variant=3929576283286&ref=collectionBuy.

52.     Additionally, each of the '812 Accused Products, including for example, the Anker 313 Pad, is configured to prevent the transmission of power in the absence of an electric load. For example, Anker advertises the Anker 313 Pad as including a "MultiProtect" safety system "equipped with foreign object detection, short circuit protection, temperature control and more, so you can experience wireless charging with total peace of mind."



**Ultra-Safe**

Our exclusive MultiProtect safety system is equipped with foreign object detection, short circuit protection, temperature control and more, so you can experience wireless charging with total peace of mind.

https://www.anker.com/products/a2503?variant=39295736283286&ref=collectionBuy.

53.     Additionally, on information and belief, the Anker 313 Pad is compliant with the Qi Standard, which describes the removal of power in the absence of an electric load.

54.     Each of the '812 Accused Products, including for example, the Anker 313 Pad, also includes at least one primary inductor wired to a power supply. For example, the Anker 313 Pad includes a primary coil that is wired to a power supply connectable, for example, to a wall outlet via, for example, the USB/micro-USB cable included with the Anker 313 Pad.

55.     Each of the '812 Accused Products, including for example, the Anker 313 Pad, also includes at least one primary detector in the locality of the primary inductor, for inductively coupling with a secondary inductor wired to said electric load. For example, on information and

14

belief, the Anker 313 Pad is Qi-compliant and configured consistent with Qi's A11a power transmitter design, which requires at least one primary detector in the locality of the primary inductor..

56.      Each of the '812 Accused Products, including for example, the Anker 313 Pad, is configured to transmit power by way of the primary inductor contained therein. For example, the Anker 313 Pad includes a primary inductor (coil) underneath a surface, on which a secondary unit may be placed for wireless charging (receiving power transmitted by the primary inductor in the Anker 313 Pad).

57.      Each of the '812 Accused Products, including for example, the Anker 313 Pad, is configured to detect that the primary inductor is transmitting power (*e.g.*, using the current monitor, per Qi's A11a power transmitter design). Each of the '812 Accused Products, including for example, the Anker 313 Pad, is also configured to detect that the primary inductor is inductively coupled to a secondary inductor.

58.      Each of the '812 Accused Products, including for example, the Anker 313 Pad, is configured to disconnect the primary inductor from the power supply if no secondary inductor is detected. For example, the Anker 313 is indicated as compliant with the Qi Standard, which requires the removal of power in the absence of an electric load.

59.      The foregoing features and capabilities of the Anker 313 Pad, and Anker's description and/or demonstration thereof, including in user manuals and advertising, and in view of the Qi Standard, reflect Anker's direct infringement by satisfying every element of at least claims 9-11 of the '812 Patent, under 35 U.S.C. § 271(a).

60.      Defendant has indirectly infringed at least claims 9-11 of the '812 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing the

use, offering for sale, selling, or importation of at least the '812 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '812 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides, such as those for the Anker 313 located at the following website: https://www.anker.com/products/a2503?variant=39295736283286&ref=collectionBuy. Defendant is therefore liable for infringement of the '812 Patent pursuant to 35 U.S.C. § 271(b).

61.     Defendant has indirectly infringed at least claims 9-11 of the '812 Patent by, among other things, contributing to the direct infringement of others, including customers of the '812 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '812 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

62.     For example, the '812 Accused Products include at least one component to inductively transmit power and prevent the transmission of such power in the absence of an electric load. This is a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such component is a material part of the invention and upon information and belief is not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '812 Patent pursuant to 35 U.S.C. § 271(c).

63.     Defendant has been on notice of the '812 Patent since at least November 11, 2018. By the time of trial, Defendant will thus have known and intended (since receiving such notice),

that its continued actions would actively induce and contribute to actual infringement of at least claims 9-11 of the '812 Patent.

64.     Defendant undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed the '812 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least November 11, 2018, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '812 Patent, and that the '812 Patent is valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '812 Patent, particularly in light of the standard compliance, nor could it reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, Defendant willfully infringes the '812 Patent.

65.     Powermat has been damaged by Defendant's infringement of the '812 Patent.

### COUNT 2 – INFRINGEMENT OF U.S. PATENT NO. 8,626,461

66.     Powermat incorporates paragraphs 1-65 above by reference.

67.     The '461 Patent is directed to an apparatus for monitoring power efficiency in a wireless power transmission system. For example, the '461 Patent discloses an inductive power outlet that contains a power monitor for measuring input power received by a primary coil from a power supply, a signal detector for detecting signals carrying data relating to output power received by a secondary coil inductively coupled with the primary coil, and a processor that receives data relating to input power and output power and determines an index of power-loss indicative of the efficiency of the inductive coupling.

68.     Defendant has directly infringed one or more claims of the '461 Patent in this district and elsewhere in Texas, including at least claims 13-14 literally and/or under the doctrine

of equivalents, by or through its sale, offer for sale, manufacture, use, or import of its wireless charging products, including at least the Anker 747 3-in-1 Cube with MagSafe, Anker 737 MagGo Charger (3-in-1 Station), 613 Magnetic Wireless Charger (MagGo), 623 Magnetic Wireless Charger (MagGo), 633 Magnetic Wireless Charger (MagGo), 544 Wireless Charger (4-in-1 Stand), 533 Magnetic Wireless Charger (3-in-1 Stand), 313 Wireless Charger (Stand), 315 Wireless Charger (Pad), 313 Wireless Charger (Pad), 335 Wireless Charger (3-in-1 Station), 622 Magnetic Battery (MagGo), 633 Magnetic Battery, 621 Magnetic Battery (MagGo), 622 Magnetic Battery (MagGo), 521 Magnetic Battery (PowerCore 5K), and 533 Wireless Power Bank (PowerCore 10K) (collectively, "the '461 Accused Products"). Powermat reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '461 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

69.     At least some of the asserted claims of the '461 Patent are essential to practicing the Qi Standard. Anker has indicated the Anker 533 Wireless Charger (3-in-1 Stand) ("Anker 533") as complying with the Qi Standard. In addition, Anker has indicated the Anker 533 as comporting with the Qi Standard's A11a power transmitter design. As such, the Anker 533, and all materially similar Anker products, infringe at least claims 13-14 of the '461 Patent, literally and/or under the doctrine of equivalents.

70.     Each of the '461 Accused Products, including for example, the Anker 533, includes a primary coil and is configured for inductively coupling with a secondary coil wired to an electric load (*e.g.*, a secondary coil wired to a battery within an iPhone).



https://www.anker.com/products/b2538?variant=42455408574614.

71.     Each of the '461 Accused Products, including for example, the Anker 533, also includes an efficiency monitor. For example, Anker advertises the Anker 533 as offering "multiple advanced safety options such as surge protection, temperature control and more to keep you and your devices safe."

• **Completely Safe**: Exclusive Anker technology offers multiple advanced safety options such as surge protection, temperature control and more to keep you and your devices safe.

https://www.anker.com/products/b2538?variant=42455408574614.

72.     Each of the '461 Accused Products, including for example, the Anker 533, also includes an input power monitor configured to measure input power received by the primary coil from the power supply. For example, on information and belief, the Anker 533 is compliant with the Qi Standard, including, for example, version 1.2.4 of the Qi Wireless Power Transfer System/Power Class 0 Specification. On information and belief, the Anker 533 follows the MP-A20 Reference Design appended thereto, which describes an input power monitor, such as a current sensing element, to measure the input power received by the primary coil. *See, e.g.*, Qi MP-A20 Addendum at 18.

73.     Each of the '461 Accused Products, including for example, the Anker 533, also includes a signal detector configured to detect signals carrying data pertaining to output power received by the secondary coil. For example, consistent with the Qi Standard, the Anker 533 is configured to perform a digital ping of the secondary side, for example, by applying a power signal and detecting a responsive packet from the secondary side containing a Signal Strength Packet carrying data pertaining to power received by the secondary coil of a secondary device. During a Power Transfer Phase, the Anker 533 is configured to detect a Control Error Packet carrying data pertaining to power received by the secondary coil of a secondary device.

74.     Each of the '461 Accused Products, including for example, the Anker 533, also includes a processor configured to receive data pertaining to the input power and the output power. For example, in accordance with the configuration set forth in the MP-A20 reference design, the Anker 533 incorporates at least one controller configured to receive and decode messages and perform power control algorithms based on input and output power.

75.     Each of the '461 Accused Products, including for example, the Anker 533, also includes a processor configured to determine an index of power-loss indicative of the efficiency of an inductive coupling between the primary coil and the secondary coil. For example, on information and belief, the Anker 533 complies with the Extended Power Profile (EPP) set forth in the Qi Standard. On information, in accordance with the EPP, the Anker 533 calculates an index of power loss, for example, in support of foreign object detection. *See, e.g.*, https://www.wirelesspowerconsortium.com/products/12342.

76.     Each of the '461 Accused Products, including for example, the Anker 533, is configured such that the index of power-loss includes at least an efficiency quotient Q, defined as the ratio of the output power to the input power, or an efficiency differential Δ, defined as the

difference between the output power and the input power. For example, in accordance with the EPP, the Anker 533 calculates an index of power loss, for example, in support of foreign object detection. According to the Qi standard, one of the methods for calculating the power loss is to calculate the difference between the power transmitted by the primary coil and the power received by the secondary coil.

77.     The foregoing features and capabilities of the Anker 533, and Defendant's description and/or demonstration thereof, including in user manuals and advertising, and in view of the Qi Standard, reflect Defendant's direct infringement by satisfying every element of at least claims 13-14 of the '461 Patent, under 35 U.S.C. § 271(a).

78.     Defendant has indirectly infringed at least claims 13-14 of the '461 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the '461 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '812 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides, such as those for the Anker 533 located at the following website: https://www.anker.com/products/b2538?variant=42455408574614. Defendant is therefore liable for infringement of the '461 Patent pursuant to 35 U.S.C. § 271(b).

79.     Defendant has indirectly infringed at least claims 13-14 of the '461 Patent by, among other things, contributing to the direct infringement of others, including customers of the '461 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented process, constituting a material part of the invention, knowing the same

to be especially made or especially adapted for use in infringement of the '461 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

80.     For example, the '461 Accused Products include at least one component to inductively transmit power and monitor power transmission efficiency. This is a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such component is a material part of the invention and upon information and belief is not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '461 Patent pursuant to 35 U.S.C. § 271(c).

81.     Defendant has been on notice of the '461 Patent since at least November 11, 2018. By the time of trial, Defendant will thus have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of at least claims 13-14 of the '461 Patent.

82.     Defendant undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed the '461 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least November 11, 2018, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '461 Patent, and that the '461 Patent is valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '461 Patent, particularly in light of the standard compliance, nor could it reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, Defendant willfully infringes the '461 Patent.

83.     Powermat has been damaged by Defendant's infringement of the '461 Patent.

## COUNT 3 – INFRINGEMENT OF U.S. PATENT NO. 9,048,696

84.     Powermat incorporates paragraphs 1-83 above by reference.

85.     The '696 Patent is directed to an apparatus and method of transferring power to an inductive power receiver.  For example, the '696 Patent discloses an inductive power outlet that includes a platform with a primary inductive coil, for supporting an inductive power receiver with a secondary coil; an alignment mechanism for facilitating alignment between the outlet and receiver, and formation of an inductive coupling having a characteristic resonant frequency; and a driving circuit that includes a switching circuit for providing an oscillating driving voltage to induce a secondary voltage in a secondary inductive coil, where the driving circuit produces the oscillating driving voltage at a transmission frequency substantially different from the characteristic resonant frequency of the inductive couple.

86.     Defendant has directly infringed one or more claims of the '696 Patent in this district and elsewhere in Texas, including at least claims 1-7, 9, 10, and 14 literally and/or under the doctrine of equivalents, by or through its sale, offer for sale, manufacture, use, or import of its wireless charging products, including at least the Anker 747 3-in-1 Cube with MagSafe, Anker 737 MagGo Charger (3-in-1 Station), 613 Magnetic Wireless Charger (MagGo), 623 Magnetic Wireless Charger (MagGo), 633 Magnetic Wireless Charger (MagGo), 544 Wireless Charger (4-in-1 Stand), 533 Magnetic Wireless Charger (3-in-1 Stand), 313 Wireless Charger (Stand), 315 Wireless Charger (Pad), 313 Wireless Charger (Pad), 335 Wireless Charger (3-in-1 Station), 622 Magnetic Battery (MagGo), 633 Magnetic Battery, 621 Magnetic Battery (MagGo), 622 Magnetic Battery (MagGo), 522 Magnetic Wireless Charger (3-in-1 Stand), 521 Magnetic Battery (PowerCore 5K), 533 Wireless Power Bank (PowerCore 10K), PowerWave Magnetic 2-in-1 Stand Lite, PowerWave 3-in-1 Stand with Watch Charging Cable Holder, PowerWave Select+ Magnetic Pad, and PowerWave Select Magnetic Stand (collectively, "the '696 Accused Products").

Powermat reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '696 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

87.     At least some of the asserted claims of the '696 Patent are essential to practicing the Qi Standard. Anker has indicated the Anker 737 MagGo as complying with the Qi Standard. In addition, Anker has indicated the Anker 737 MagGo as comporting with the Qi Standard's A11a power transmitter design. As such, the Anker 737 MagGo, and all materially similar Anker products, infringe at least claims 1-7, 9, 10, and 14 of the '696 Patent, literally and/or under the doctrine of equivalents.

88.     Each of the '696 Accused Products, including for example, the Anker 737 MagGo is a wireless charger, and therefore is operable to transfer power to an inductive power receiver.



https://www.anker.com/products/b2599?variant=42519665016982.

89.     Each of the '696 Accused Products, including for example, the Anker 737 MagGo, has a platform for supporting an inductive power receiver. For example, the Anker 737 MagGo has platforms for several different devices, including for example, an iPhone, Apple Watch, or Airpods.



https://www.anker.com/products/b2599?variant=42519665016982.

90.     Each of the '696 Accused Products, including for example, the Anker 737 MagGo, incorporates at least one primary coil. For example, on information and belief, the Anker 737 MagGo is Qi-compliant and follows the recommended A11a transmitter design, which requires at least one primary coil in the power transmitter. *See, e.g.*, Qi Reference Designs at 66-67. In accordance therewith, the Anker 737 MagGo incorporates at least one primary coil for inductively transferring power, for example, to a mobile device.

91.     Each of the '696 Accused Products, including for example, the Anker 737 MagGo, includes an alignment mechanism configured to facilitate alignment between the primary inductive outlet and the inductive power receiver such that an inductive couple is formed between the primary inductive coil and a secondary inductive coil of the inductive power receiver. For example, the Anker 737 MagGo incorporates a MagSafe module to facilitate alignment between the primary coil of the Anker 737 MagGo with a secondary coil in an compatible device, like an iPhone.



https://www.anker.com/products/b2599?variant=42519665016982.

92.     Each of the '696 Accused Products, including for example, the Anker 737 MagGo, is configured such that the inductive couple formed with a secondary device has a characteristic resonant frequency. For example, on information and belief, the Anker 737 is Qi-compliant, and accordingly has a characteristic frequency when coupled with a secondary device. For example, in accordance with reference design A11a, the Anker 737 MagGo, on information and belief, incorporates at least a characteristic resonant frequency (*e.g.*, about 100 kHz). *See, e.g.*, Qi Reference Design at 69.

93.     Each of the '696 Accused Products, including for example, the Anker 737 MagGo, includes a driving circuit wired to the primary inductive coil, where the driving circuit includes a switching unit configured and operable to provide an oscillating driving voltage across the primary

inductive coil such that a secondary voltage is induced in the secondary inductive coil. For example, on information and belief, the Anker 737 MagGo is Qi standard-compliant, and therefore incorporates a driving circuit—for example, a full-bridge inverter—wired to the primary inductive coil. The full-bridge inverter has a switching unit configured and operable to provide an oscillating driving voltage across the primary inductive coil such that a secondary voltage is induced in the secondary inductive coil. For example, on information and belief, the applied driving voltage is sufficient to charge a phone in about one hour (*e.g.*, 47 minutes for iPhone 14 Pro Max). On information and belief, the inverter oscillates at an operating frequency and incorporates a switching unit to provide the oscillating voltage.

- **Fast, One-Step Charging:** Make charging a snap and enjoy 15W high-speed charging every time, thanks to the official MagSafe module. Charge an iPhone 14 Pro Max to 50% in just 47 minutes*.
- **A Place for Your Apple Devices**: All-in-one wireless charging station for your iPhone, Apple Watch, and AirPods.

https://www.anker.com/products/b2599?variant=42519665016982#.

94.     Each of the '696 Accused Products, including for example, the Anker 737 MagGo, includes a driving circuit (*e.g.*, full-bridge inverter) that has a switching unit configured and operable to provide an oscillating driving voltage at a transmission frequency that is substantially different from the characteristic resonant frequency of the inductive couple. For example, the Qi Standard discloses an operating frequency that is substantially different from the resonant frequency of 100 kHz.

95.     The foregoing features and capabilities of the Anker 737 MagGo, and Defendant's description and/or demonstration thereof, including in user manuals and advertising, and in view of the Qi Standard, reflect Defendant's direct infringement by satisfying every element of at least claims 1-7, 9, 10, and 14 of the '696 Patent, under 35 U.S.C. § 271(a).

96.     Defendant has indirectly infringed at least claims 1-7, 9, 10, and 14 of the '696 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the '696 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '696 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides, such as those for the Anker 737 MagGo located at the following website: https://www.anker.com/products/b2599?variant=42519665016982. Defendant is therefore liable for infringement of the '696 Patent pursuant to 35 U.S.C. § 271(b).

97.     Defendant has indirectly infringed at least claims 1-7, 9, 10, and 14 of the '696 Patent by, among other things, contributing to the direct infringement of others, including customers of the '696 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '696 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

98.     For example, the '696 Accused Products include at least one component to inductively transmit power and ensure alignment with a secondary device. This is a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such component is a material part of the invention and upon information and belief is not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '696 Patent pursuant to 35 U.S.C. § 271(c).

99.     Defendant has been on notice of the '696 Patent since at least November 11, 2018. By the time of trial, Defendant will thus have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of at least claims 1-7, 9, 10, and 14 of the '696 Patent.

100.    Defendant undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed the '696 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least November 11, 2018, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '696 Patent, and that the '696 Patent is valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '696 Patent, particularly in light of the standard compliance, nor could it reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, Defendant willfully infringes the '461 Patent.

101.    Powermat has been damaged by Defendant's infringement of the '696 Patent.

**COUNT 4 – INFRINGEMENT OF U.S. PATENT NO. 8,981,598**

102.    Powermat incorporates paragraphs 1-101 above by reference.

103.    The '598 Patent is directed to an inductive power outlet for transmitting power to one or more inductive power receivers. For example, the '598 Patent discloses an inductive power outlet that includes a trigger sensor for detecting a release signal indicating proximity of an inductive power receiver, and a signal detector operable to detect instruction signals from the inductive power receiver concurrently with power transfer. The release signal triggers the outlet to generate an activation signal detectable by the power receiver. The signal detector may be operable to detect an identification signal sent by the power receiver and to initiate driving of the

primary inductor such that the power receiver draws power from the outlet for a limited time duration and to stop driving if no instruction signal is received during the limited time duration.

104.    Defendant has directly infringed one or more claims of the '598 Patent in this district and elsewhere in Texas, including at least claims 1-3 and 5 literally and/or under the doctrine of equivalents, by or through its sale, offer for sale, manufacture, use, or import of its wireless charging products, including at least the Anker 747 3-in-1 Cube with MagSafe, Anker 737 MagGo Charger (3-in-1 Station), 613 Magnetic Wireless Charger (MagGo), 623 Magnetic Wireless Charger (MagGo), 633 Magnetic Wireless Charger (MagGo), 544 Wireless Charger (4-in-1 Stand), 533 Magnetic Wireless Charger (3-in-1 Stand), 313 Wireless Charger (Stand), 315 Wireless Charger (Pad), 313 Wireless Charger (Pad), 335 Wireless Charger (3-in-1 Station), 622 Magnetic Battery (MagGo), 633 Magnetic Battery, 621 Magnetic Battery (MagGo), 622 Magnetic Battery (MagGo), 521 Magnetic Battery (PowerCore 5K), and 533 Wireless Power Bank (PowerCore 10K) (collectively, "the '598 Accused Products"). Powermat reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '598 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

105.    At least some of the asserted claims of the '598 Patent are essential to practicing the Qi Standard. Anker has indicated the Anker 313 Pad as complying with the Qi Standard. In addition, Anker has indicated the Anker 313 Pad as comporting with the Qi Standard's A11a power transmitter design. As such, the Anker 313 Pad, and all materially similar Anker products, infringe at least claims 1-3 and 5 of the '598 Patent, literally and/or under the doctrine of equivalents.

106.     Each of the '598 Accused Products, including for example, the Anker 313 Pad, is an inductive power outlet for transmitting power to at least one inductive power receiver. For example, the Anker 313 Pad is a wireless charger that includes an inductive coil (or primary unit coil) for transmitting power wirelessly to power receiver in a compatible device (*e.g.*, iPhone) that is operable to receive power wirelessly. *See, e.g.*, https://www.anker.com/products/a2503?variant=39295736283286&ref=collectionBuy.

107.     Each of the '598 Accused Products, including for example, the Anker 313 Pad, includes at least one primary inductor wired to a power supply, where the primary inductor is for forming an inductive couple with at least one secondary inductive coil associated with the inductive power receiver.

 

*Id.*

108.     Each of the '598 Accused Products, including for example, the Anker 313 Pad, includes at least one driver configured to provide an oscillating voltage across said primary inductor. On information and belief, the Anker 313 Pad follows the Qi Specification's A11a transmitter design. In accordance with this design, the Anker 313 Pad incorporates a driver, *e.g.*, a full-bridge inverter, to drive the primary coil with an AC waveform oscillating at a high frequency.

109.    Each of the '598 Accused Products, including for example, the Anker 313 Pad, includes a trigger sensor configured to detect a release signal indicating proximity of an inductive power receiver. For example, the Anker 313 Pad incorporates an electronic circuit operating as a trigger sensor for detecting whether an object is placed on or near the charging surface and to activate power transmission when a secondary device is detected.  On information and belief, the Anker 313 is configured to detect whether the secondary side apparatus is present as opposed to a foreign object, in accordance with the Qi Standard.

110.    Each of the '598 Accused Products, including for example, the Anker 313 Pad, includes a signal detector operable to detect instruction signals from said inductive power receiver concurrently with power transfer. For example, during a power transfer phase in which the Anker 313 Pad transfers power to a secondary unit coupled with the primary coil, the Anker 313 Pad regulates the transmission of power to the secondary unit in response to a regulation signal (*e.g.* a Control Error Packet) received from the secondary unit concurrently with power transfer by modulation of the current in the primary coil.

111.    Each of the '598 Accused Products, including for example, the Anker 313 Pad, is configured to detect a release signal which triggers the inductive power outlet to generate an activation signal detectable by the inductive power receiver. For example, following a selection phase in which the Anker 313 Pad detects the presence of an object coupled with the primary coil, the Anker 313 Pad performs a digital ping operating as an activation signal to confirm the presence of a secondary unit by detecting the reception of a confirmation signal (*e.g.*, a Signal Strength Packet) indicating that a secondary device is coupled with the primary coil.

112.    The Anker 313 Pad includes a signal detector that is operable to detect an identification signal sent by the inductive power receiver to the inductive power outlet and to start

the inductive power outlet driving the primary inductor such that the inductive power receiver draws power therefrom for a limited time duration and to stop driving the oscillating voltage if no instruction signal is received during that limited time duration. For example, in accordance with the Qi Standard, during an identification and configuration phase, the Anker 313 Pad is configured to detect an identification signal received from the secondary unit. The Anker 313 Pad applies a power signal in accordance with its Operating Point as defined in the A11a reference design to allow the power receiver to draw power so as to communicate with the Anker 313 Pad concurrently with power transfer. The Anker 313 Pad maintains the initial power transfer for a limited time suitable to receive a Signal Strength Packet, and a sequence of packets expected during the identification and configuration phase, including at least an Identification Packet. The limited time duration, for example, is a timeout period after which the Anker 313 Pad removes the power signal. The Anker 313 Pad stops driving the oscillating voltage if no Signal Strength Packet, Identification Packet, or first Control Error Packet is received within the timeout period.

113.   The foregoing features and capabilities of the Anker 313 Pad, and Anker's description and/or demonstration thereof, including in user manuals and advertising, and in view of the Qi Standard, reflect Anker's direct infringement by satisfying every element of at least claims 1-3 and 5 of the '598 Patent, under 35 U.S.C. § 271(a).

114.   Defendant has indirectly infringed at least claims 1-3 and 5 of the '598 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the '598 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '598 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least

user guides, such as those for the Anker 313 Pad located at the following website: https://www.anker.com/products/a2503?variant=39295736283286&ref=collectionBuy. Defendant is therefore liable for infringement of the '598 Patent pursuant to 35 U.S.C. § 271(b).

115.   Defendant has indirectly infringed at least claims 1-3 and 5 of the '598 Patent by, among other things, contributing to the direct infringement of others, including customers of the '598 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '598 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

116.   For example, the '598 Accused Products include at least one component to inductively transmit power to an inductive power receiver, and to drive a voltage to enable the power receiver to draw power therefrom and stop such driving if no instruction signal is received. This is a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such component is a material part of the invention and upon information and belief is not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '598 Patent pursuant to 35 U.S.C. § 271(c).

117.   Defendant has been on notice of the '598 Patent since at least November 11, 2018. By the time of trial, Defendant will thus have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of at least claims 1-3 and 5 of the '598 Patent.

118.   Defendant undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed the '598 Patent, which has been duly issued by the

USPTO, and is presumed valid. For example, since at least November 11, 2018, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '598 Patent, and that the '598 Patent is valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '598 Patent, particularly in light of the standard compliance, nor could it reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, Defendant willfully infringes the '598 Patent.

119.    Powermat has been damaged by Defendant's infringement of the '598 Patent.

### COUNT 5 – INFRINGEMENT OF U.S. PATENT NO. 9,006,937

120.    Powermat incorporates paragraphs 1-119 above by reference.

121.    The '937 Patent is directed to a system and method for controlling the wireless transmission of power over an inductive coil-to-coil coupling. For example, the '937 Patent discloses an inductive power outlet that includes a primary inductive coil for forming an inductive couple with a secondary coil in a power receiver, a signal receiver for receiving feedback signals from the receiver, a driver for providing an oscillating driving voltage to the primary coil according to instruction signals received concurrent with inductive power transfer between the coils, where the driver maintains the same power level when a perpetuation signal is received.

122.    Defendant has directly infringed one or more claims of the '937 Patent in this district and elsewhere in Texas, including at least claims 8-12 literally and/or under the doctrine of equivalents, by or through its sale, offer for sale, manufacture, use, or import of its wireless charging products, including at least the Anker 747 3-in-1 Cube with MagSafe, Anker 737 MagGo Charger (3-in-1 Station), 613 Magnetic Wireless Charger (MagGo), 623 Magnetic Wireless Charger (MagGo), 633 Magnetic Wireless Charger (MagGo), 544 Wireless Charger (4-in-1 Stand),

533 Magnetic Wireless Charger (3-in-1 Stand), 313 Wireless Charger (Stand), 315 Wireless Charger (Pad), 313 Wireless Charger (Pad), 335 Wireless Charger (3-in-1 Station), 622 Magnetic Battery (MagGo), 633 Magnetic Battery, 621 Magnetic Battery (MagGo), 622 Magnetic Battery (MagGo), 521 Magnetic Battery (PowerCore 5K), and 533 Wireless Power Bank (PowerCore 10K) (collectively, "the '937 Accused Products"). Powermat reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '937 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

123.    At least some of the asserted claims of the '937 Patent are essential to practicing the Qi Standard. Anker has indicated the Anker 313 Pad as complying with the Qi Standard. In addition, Anker has indicated the Anker 313 Pad as comporting with the Qi Standard's A11a power transmitter design. As such, the Anker 313 Pad, and all materially similar Anker products, infringe at least claims 8-12 of the '937 Patent, literally and/or under the doctrine of equivalents.

124.    Each of the '937 Accused Products, including for example, the Anker 313 Pad, is an inductive power outlet operable to transfer power to an electric load via at least one inductive power receiver. For example, the Anker 313 Pad is a wireless charger that includes an inductive coil (or primary unit coil) for transmitting power wirelessly to power receiver in a compatible device (*e.g.*, iPhone) that is operable to receive power wirelessly. *See* https://www.anker.com/products/a2503?variant=39295736283286&ref=collectionBuy.    The Anker 313 Pad therefore includes at least one primary inductive coil for forming an inductive couple with at least one secondary inductive coil (*e.g.*, in an iPhone) associated with the at least one inductive power receiver.

125.    Each of the '937 Accused Products, including for example, the Anker 313 Pad, includes a signal receiver for receiving feedback signals from the inductive power receiver. For example, on information and belief, the Anker 313 Pad incorporates one or more circuit components (e.g., capacitors, resistors, and diodes) and a controller to receive signals transmitted via modulation to the primary coil.

126.    Additionally, on information and belief, the Anker 313 Pad incorporates a Communications & Control Unit, in accordance with the Qi A11a Reference Design, for receiving and decoding feedback signals from a power receiver. For example, on information and belief, as per the Qi Standard, the Anker 313 Pad is configured to confirm the presence of a secondary unit by detecting the reception of a confirmation signal.

127.    Each of the '937 Accused Products, including for example, the Anker 313 Pad, includes a driver operable to provide an oscillating driving voltage to the primary inductive coil according to instruction signals received concurrently with inductive power transfer between the primary and secondary inductive coils. For example, on information and belief, in accordance with Qi Reference Design A11a, the Anker 313 Pad incorporates a driver such as a full-bridge inverter to drive the primary coil with an AC waveform oscillating at a high frequency. Further in accordance with the Qi Standard, the Anker 313 Pad adjusts its operating power in accordance with instruction signals received via modulation.

128.    The driver in each of the '937 Accused Products, including for example, the Anker 313 Pad, is operable to continue driving the primary inductive coil at the same power level when a perpetuation signal is received. For example, on information and belief, as per the Qi Standard, the Anker 313 Pad is configured to maintain the same power level if the received Control Error Packet has a value of zero. Specifically, the Anker 313 Pad does not adjust its operating power if

it receives a zero value for the Control Error Packet because a Control Error Value of zero indicates that the actual Control Point of the power receiver is the desired Control Point.

129.    The foregoing features and capabilities of the Anker 313 Pad, and Anker's description and/or demonstration thereof, including in user manuals and advertising, and in view of the Qi Standard, reflect Anker's direct infringement by satisfying every element of at least claims 8-12 of the '937 Patent, under 35 U.S.C. § 271(a).

130.    Defendant has indirectly infringed at least claims 8-12 of the '937 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the '937 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '937 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides, such as those for the Anker 313 Pad located at the following website: https://www.anker.com/products/a2503?variant=3929576283286&ref=collectionBuy. Defendant is therefore liable for infringement of the '937 Patent pursuant to 35 U.S.C. § 271(b).

131.    Defendant has indirectly infringed at least claims 8-12 of the '937 Patent by, among other things, contributing to the direct infringement of others, including customers of the '937 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '937 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

132.    For example, the '937 Accused Products include at least one component to control the wireless transmission of power. This is a component of a patented machine, manufacture, or

combination, or an apparatus for use in practicing a patented process. Furthermore, such component is a material part of the invention and upon information and belief is not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '937 Patent pursuant to 35 U.S.C. § 271(c).

133.    Defendant has been on notice of the '937 Patent since at least November 11, 2018. By the time of trial, Defendant will thus have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of at least claims 8-12 of the '937 Patent.

134.    Defendant undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed the '937 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least November 11, 2018, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '937 Patent, and that the '937 Patent is valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '937 Patent, particularly in light of the standard compliance, nor could it reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, Defendant willfully infringes the '937 Patent.

135.    Powermat has been damaged by Defendant's infringement of the '937 Patent.

## COUNT 6 – INFRINGEMENT OF U.S. PATENT NO. 9,083,204

136.    Powermat incorporates paragraphs 1-135 above by reference.

137.    The '204 Patent is directed to an inductive power transfer system in which power is controlled by adjusting transmission frequency. For example, the '204 Patent discloses an inductive power outlet that includes a driver for producing a driving voltage that oscillates at a

non-resonant transmission frequency substantially different from the characteristic resonant frequency of the inductive couple, and for increasing or decreasing power by increasing or decreasing the non-resonant transmission frequency based on detected first and second signals.

138.    Defendant has directly infringed one or more claims of the '204 Patent in this district and elsewhere in Texas, including at least claims 1-5 and 8 literally and/or under the doctrine of equivalents, by or through its sale, offer for sale, manufacture, use, or import of its wireless charging products, including at least the Anker 747 3-in-1 Cube with MagSafe, Anker 737 MagGo Charger (3-in-1 Station), 613 Magnetic Wireless Charger (MagGo), 623 Magnetic Wireless Charger (MagGo), 633 Magnetic Wireless Charger (MagGo), 544 Wireless Charger (4-in-1 Stand), 533 Magnetic Wireless Charger (3-in-1 Stand), 313 Wireless Charger (Stand), 315 Wireless Charger (Pad), 313 Wireless Charger (Pad), 335 Wireless Charger (3-in-1 Station), 622 Magnetic Battery (MagGo), 633 Magnetic Battery, 621 Magnetic Battery (MagGo), 622 Magnetic Battery (MagGo), 521 Magnetic Battery (PowerCore 5K), and 533 Wireless Power Bank (PowerCore 10K) (collectively, "the '204 Accused Products"). Powermat reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '204 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

139.    At least some of the asserted claims of the '204 Patent are essential to practicing the Qi Standard. Anker has indicated the Anker 737 MagGo as complying with the Qi Standard. In addition, Anker has indicated the Anker 737 MagGo as comporting with the Qi Standard's A11a power transmitter design. As such, the Anker 737 MagGo, and all materially similar Anker

products, infringe at least claims 1-5 and 8 of the '204 Patent, literally and/or under the doctrine of equivalents.

140.    Each of the '204 Accused Products, including for example, the Anker 737 MagGo, is a wireless charger, and therefore operable to transfer power to an inductive power receiver as part of an inductive power system (https://www.anker.com/products/b2599?variant=42519665016982).

141.    Each of the '204 Accused Products, including for example, the Anker 737 MagGo, is a wireless charger, and therefore operates as an inductive power outlet to transfer power to an inductive power receiver as part of an inductive power system. On information and belief, the Anker 737 follows the Qi Standard's recommended A11a transmitter design. In accordance with reference design A11a, the Anker 737 MagGo incorporates at least one primary coil wired to a power supply via a driver.

142.    Each of the '204 Accused Products, including for example, the Anker 737 MagGo, is configured to form an inductive couple having a characteristic resonant frequency with at least one secondary inductive coil wired to an electric load. The Anker 737 MagGo is Qi Standard-compliant. Thus, it has a characteristic frequency when coupled with a secondary device. On information and belief, the Anker 737 follows the recommended A11a transmitter design. In accordance with reference design A11a, the Anker 737 MagGo incorporates at least a characteristic resonant frequency.

143.    Each of the '204 Accused Products, including for example, the Anker 737 MagGo, is configured to couple and transmit power to a secondary inductive coil associated with an inductive power receiver such as a phone, a watch, or wireless ear buds. The driver in the Anker 737 MagGo is configured to provide a driving voltage across said primary inductive coil. On

information and belief, the Anker 737 MagGo follows the recommended A11a transmitter design. In accordance with reference design A11a, the Anker 737 MagGo incorporates a driver, e.g. an inverter that provides a driving voltage across the primary inductive coil.

144.     The driver in each of the '204 Accused Products, including for example, the Anker 737 MagGo, is Qi Standard-compliant and configured to provide a driving voltage oscillating at a non-resonant transmission frequency substantially different from the characteristic resonant frequency of the inductive couple. The driving circuit (*e.g.*, full-bridge inverter) has a switching unit configured and operable to provide an oscillating driving voltage at an operating frequency in the range 110 - 148 kHz. For example, the operating frequency is about 146 kHz during Digital Ping.

145.     Each of the '204 Accused Products, including for example, the Anker 737 MagGo, incorporates a signal detector adapted to detect a first signal and a second signal. For example, the Anker 737 MagGo incorporates detection circuitry including for example a current sensing unit which in conjunction with the primary coil is adapted to detect signals like Control Error Packet received from a power receiver. In addition, the Anker 737 incorporates a Communications & Control Unit adapted to receive and decode messages e.g. Control Error Packets received from the power receiver and perform power control algorithms in response to the decoded messages.

146.     Each of the '204 Accused Products, including for example, the Anker 737 MagGo, is configured to provide less power by increasing said non-resonant transmission frequency by an incremental value when said first signal is detected by the detector. For example, a positive value of the Control Error Packet causes the Anker 737 MagGo to increase voltage / decrease transmission frequency. For example, the Anker 737 MagGo uses a lower operating frequency to transfer a higher amount of power. For example, the Anker 737 MagGo uses a PID algorithm to

determine an incremental value by which to increase the non-resonant operating frequency starting from an initial operating frequency, e.g. starting from 146 kHz.

147.    Each of the '204 Accused Products, including for example, the Anker 737 MagGo, is configured to provide more power by decreasing said non-resonant transmission frequency by an incremental value when said second signal is detected by the detector. For example a negative value of the Control Error Packet causes the Anker 737 MagGo to decrease voltage/increase transmission frequency. For example, the Anker 737 MagGo uses a higher operating frequency to transfer a lower amount of power. For example, the Anker 737 MagGo uses a PID algorithm to determine an incremental value by which to decrease the non-resonant operating frequency starting from an initial operating frequency, e.g. starting from 146 kHz.

148.    The foregoing features and capabilities of the Anker 737 MagGo, and Anker's description and/or demonstration thereof, including in user manuals and advertising, and in view of the Qi Standard, reflect Anker's direct infringement by satisfying every element of at least claims 1-5 and 8 of the '204 Patent, under 35 U.S.C. § 271(a).

149.    Defendant has indirectly infringed at least claims 1-5 and 8 of the '204 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the '204 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '204 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least user guides, such as those for the Anker 737 MagGo located at the following website: https://www.anker.com/products/a2503?variant=39295736283286&ref=collectionBuy. Defendant is therefore liable for infringement of the '204 Patent pursuant to 35 U.S.C. § 271(b).

150.     Defendant has indirectly infringed at least claims 1-5 and 8 of the '204 Patent by, among other things, contributing to the direct infringement of others, including customers of the '204 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '204 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

151.     For example, the '204 Accused Products include at least one component to magnetically couple with a pinless power plug and inductively transmit power thereto. This is a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such component is a material part of the invention and upon information and belief is not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '204 Patent pursuant to 35 U.S.C. § 271(c).

152.     Defendant has been on notice of the '204 Patent since at least November 11, 2018. By the time of trial, Defendant will thus have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of at least claims 1-5 and 8 of the '204 Patent.

153.     Defendant undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed the '204 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least November 11, 2018, Defendant has been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '204 Patent, and that the '204 Patent is valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement

of the '204 Patent, particularly in light of the standard compliance, nor could it reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, Defendant willfully infringes the '204 Patent.

154.     Powermat has been damaged by Defendant's infringement of the '204 Patent.

## COUNT 7 – INFRINGEMENT OF U.S. PATENT NO. 8,049,370

155.     Powermat incorporates paragraphs 1-154 above by reference.

156.     The '370 Patent is directed to an inductive power transmission platform containing multiple inductive coils. For example, the '370 Patent discloses an inductive power transmission platform that includes at least one cluster of primary inductors for coupling with a secondary inductor, a common driver connected to each primary inductor in the cluster via an individual power switch, where the power switch is operable to disconnect the primary inductor from the common driver only after the driver is deactivated, such that no current passes through the switch prior to the switch being opened.

157.     Defendant has directly infringed one or more claims of the '370 Patent in this district and elsewhere in Texas, including at least claims 1, 7, 8, 11 literally and/or under the doctrine of equivalents, by or through its sale, offer for sale, manufacture, use, or import of its wireless charging products, including at least the 544 Wireless Charger (4-in-1 Stand), 533 Wireless Charger (3-in-1 Stand), 335 Wireless Charger (3-in-1 Station), 313 Wireless Charger (Stand), and PowerWave 3-in-1 Station with Watch Charging Holder (collectively, "the '370 Accused Products"). Powermat reserves the right to discover and pursue any additional infringing devices that incorporate infringing functionalities. For the avoidance of doubt, the '370 Accused Products are identified to describe the Defendant's infringement and in no way limit the discovery

45

and infringement allegations against Defendant concerning other devices that incorporate the same or reasonably similar functionalities.

158. At least some of the asserted claims of the '370 Patent are essential to practicing the Qi Standard. Anker has indicated the Anker 313 Wireless Charger (Stand) ("Anker 313 Stand") as complying with the Qi Standard. In addition, Anker has indicated the Anker 313 Stand as comporting with the Qi Standard's A28a power transmitter design. As such, the Anker 313 Stand, and all materially similar Anker products, infringe at least claims 1, 7, 8, and 11 of the '370 Patent, literally and/or under the doctrine of equivalents.

159. Each of the Accused '370 Products, including for example, the Anker 313 Stand, is an inductive power transmission platform. *See*, *e.g.*, Anker's website and technical specifications (https://www.anker.com/products/a2524?variant=37438027137174&ref=collectionBuy). For example, the Anker 313 Stand is a wireless charger for transmitting wireless power to *e.g.,* a mobile device (*i.e.*, iPhone).

## Anker 313 Wireless Charger (Stand)          Series 3

Anker Wireless Charger, 313 Wireless Charger (Stand), Qi-Certified for iPhone 13, iPhone 13 Pro, iPhone 13 Pro Max, iPhone 13 mini, iPhone 12, SE, 11, 11 Pro, 11 Pro Max, XR, XS Max, 10W Fast-Charging Galaxy S20, S10 (No AC Adapter)



https://www.anker.com/products/a2524?variant=37438027137174&ref=collectionBuy.

160.   Each of the Accused '370 Products, including for example, the Anker 313 Stand, includes at least one cluster of primary inductors configured to couple with at least one secondary inductor wired to an electrical load. For example, the Anker 313 Stand includes at least one cluster of primary inductors configured to couple with at least one secondary inductor wired to an electrical load (*e.g.*, a secondary inductor wired to a battery within an iPhone).



**Versatile Viewing**

Twin charging coils let you watch videos in landscape orientation, or stand in portrait mode for web browsing and facial recognition—all while keeping the power flowing.

https://www.anker.com/products/a2524?variant=37438027137174&ref=collectionBuy.

161.    Each of the Accused '370 Products, including for example, the Anker 313 Stand, also includes a common driver connected to each primary inductor of the cluster by way of an individual power switch. For example, on information and belief, the Anker 313 Stand is Qi-compliant and follows the Qi Standard's recommended A28a transmitter design. In accordance with this design, the Anker 313 Stand incorporates a driver (*e.g.*, a full-bridge inverter) to drive the primary coils with an AC waveform oscillating at a high frequency. This common driver provides an oscillating voltage to at least one cluster of primary inductors.

162.    Each of the Accused '370 Products, including for example, the Anker 313 Stand, also includes a power switch that is operable to disconnect the primary inductor from the common driver only after the driver is deactivated, such that no current passes through the switch prior to the switch being opened. For example, the Anker 313 Stand performs at least one method to determine if a foreign object is detected and to terminate the power transfer to a mobile device if a foreign object is present.

163.    The foregoing features and capabilities of the '370 Accused Products, and Anker's description and/or demonstration thereof, including in user manuals and advertising, and in view of the Qi Standard, reflect Anker's direct infringement by satisfying every element of at least claims 1, 7, 8, 11 of the '370 Patent, under 35 U.S.C. § 271(a).

164.    Defendant has indirectly infringed at least claims 1, 7, 8, 11 of the '370 Patent in this judicial district and elsewhere in the United States by, among other things, actively inducing the use, offering for sale, selling, or importation of at least the '370 Accused Products. Defendant's customers who purchase devices and components thereof and operate such devices and components in accordance with Defendant's instructions directly infringe one or more claims of the '370 Patent in violation of 35 U.S.C. § 271. Defendant instructs its customers through at least

user guides, such as those for the Anker 313 Stand located at the following website: https://www.anker.com/products/a2503?variant=39295736283286&ref=collectionBuy. Defendant is therefore liable for infringement of the '370 Patent pursuant to 35 U.S.C. § 271(b).

165.   Defendant has indirectly infringed at least claims 1, 7, 8, 11 of the '370 Patent by, among other things, contributing to the direct infringement of others, including customers of the '370 Accused Products by making, offering to sell, or selling, in the United States, or importing a component of a patented process, constituting a material part of the invention, knowing the same to be especially made or especially adapted for use in infringement of the '370 Patent, and not a staple article or commodity of commerce suitable for substantial non-infringing use.

166.   For example, the '370 Accused Products include at least one component to magnetically couple with a pinless power plug and inductively transmit power thereto. This is a component of a patented machine, manufacture, or combination, or an apparatus for use in practicing a patented process. Furthermore, such component is a material part of the invention and upon information and belief is not a staple article or commodity of commerce suitable for substantial non-infringing use. Thus, Defendant is liable for infringement of the '370 Patent pursuant to 35 U.S.C. § 271(c).

167.   Defendant has been on notice of the '370 Patent since at least November 11, 2018. By the time of trial, Defendant will thus have known and intended (since receiving such notice), that its continued actions would actively induce and contribute to actual infringement of at least claims 1, 7, 8, 11 of the '370 Patent.

168.   Defendant undertook and continues its infringing actions despite an objectively high likelihood that such activities infringed the '370 Patent, which has been duly issued by the USPTO, and is presumed valid. For example, since at least November 11, 2018, Defendant has

been aware of an objectively high likelihood that its actions constituted and continue to constitute infringement of the '370 Patent, and that the '370 Patent is valid. On information and belief, Defendant could not reasonably, subjectively believe that its actions do not constitute infringement of the '370 Patent, particularly in light of the standard compliance, nor could it reasonably, subjectively believe that the patent is invalid. Despite that knowledge and subjective belief, and the objectively high likelihood that its actions constitute infringement, Defendant has continued its infringing activities. As such, Defendant willfully infringes the '370 Patent.

169.    Powermat has been damaged by Defendant's infringement of the '370 Patent.

## DAMAGES

As a result of Defendants' acts of infringement, Powermat has suffered actual and consequential damages. To the fullest extent permitted by law, Powermat seeks recovery of damages at least in the form of reasonable royalties.

## JURY DEMAND

Pursuant to Rule 38 of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all issues triable as such.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment for itself and against Defendant as follows:

A.  An adjudication that Defendant has infringed U.S. Patent Nos. 8,283,812; 8,626,461; 9,048,696; 8,981,598; 9,006,937; 9,083,204; and 8,049,370.

B.  An award of damages to be paid by Defendant adequate to compensate Plaintiff for Defendant's past infringement of the Asserted Patents, and any continuing or future infringement through the date such judgment is entered, including interest, costs, expenses and an accounting of all infringing acts including, but not limited to, those acts not presented at trial;

C.   A determination of a per-unit RAND royalty rate to be applied to all acts of infringement, including after the date judgment is entered;

D.   A declaration that this case is exceptional under 35 U.S.C. § 285, and an award of Plaintiff's reasonable attorneys' fees; and

E.   An award to Plaintiff of such further relief at law or in equity as the Court deems just and proper.

| | |
|---|---|
| Dated: June 5, 2023<br><br>*Of counsel:*<br>Jamie B. Beaber<br>Kfir B. Levy<br>William J. Barrow<br>Baldine Paul<br>MAYER BROWN LLP<br>1999 K Street, N.W.<br>Washington D.C. 20006<br>(202) 263-3000<br>jbeaber@mayerbrown.com<br>klevy@mayerbrown.com<br>wbarrow@mayerbrown.com<br>bpaul@mayerbrown.com | Respectfully submitted,<br><br>*/s/Geoffrey Culbertson*<br>Geoffrey Culbertson<br>Tx. Bar No. 24045732<br>Kelly B. Tidwell<br>Tx. Bar No. 20020580<br>PATTON, TIDWELL &<br>CULBERTSON, LLP<br>2800 Texas Boulevard (75503)<br>P.O. Box 5398<br>Texarkana, TX 75505-5398<br>(P) 903-792-7080<br>(F) 903-792-8233<br>gpc@texarkanalaw.com<br>kbt@texarkanalaw.com<br><br>*Counsel for Plaintiff Powermat Technologies Ltd.* |